IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

MICHELLE GENTRY,                    )
                                    )
              Plaintiff,            )
                                    )
     v.                             )   Case No.
                                    )   08-6062-CV-SJ-REL-SSA
MICHAEL J. ASTRUE, Commissioner     )
of Social Security,                 )
                                    )
              Defendant.            )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Michelle Gentry seeks review of the final decision
of the Commissioner of Social Security denying plaintiff's
application for disability benefits under Title II of the Social
Security Act ("the Act").  Plaintiff argues that the ALJ erred in
failing to give controlling weight to her treating physician,
Christopher Trimble, M.D., and the ALJ erred in failing to
contact Dr. Trimble to fully develop the record.  I find that the
substantial evidence in the record as a whole supports the ALJ's
finding that plaintiff is not disabled.  Therefore, plaintiff's
motion for summary judgment will be denied and the decision of
the Commissioner will be affirmed.

## I.    BACKGROUND

On April 6, 2005, plaintiff applied for disability benefits
alleging that she had been disabled since December 16, 1999,
which was later amended to June 1, 2004, due to a prior
application and denial of disability benefits.  Plaintiff's

disability stems from fibromyalgia and depression. Plaintiff's application was denied on July 14, 2005. On October 16, 2007, a hearing was held before an Administrative Law Judge. On December 27, 2007, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On May 30, 2008, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into

2

consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other

3

type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.  Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.  Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.  Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.  Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

4

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Barbara S. Myers, in addition to documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1990 | $ 3,002.50 | 1999 | $27,512.81 |
| 1991 | 3,305.00 | 2000 | 4,645.09 |
| 1992 | 1,714.25 | 2001 | 0.00 |
| 1993 | 2,561.25 | 2002 | 0.00 |
| 1994 | 2,606.76 | 2003 | 0.00 |
| 1995 | 7,918.07 | 2004 | 0.00 |
| 1996 | 20,552.49 | 2005 | 0.00 |
| 1997 | 21,348.49 | 2006 | 0.00 |
| 1998 | 19,867.64 | 2007 | 0.00 |

(Tr. at 86).

**Daily Activities Questionnaire**

In a Daily Activities Questionnaire dated March 3, 2005, plaintiff reported that she feeds and waters the pigs and dogs,

5

does laundry, makes beds, changes sheets, vacuums, sweeps, takes out the trash, shops, and goes to the bank and the post office (Tr. at 88-89). Plaintiff's hobbies included reading books and magazines, doing crossword puzzles, watching television and movies, playing darts, and cross stitching (Tr. at 90). Plaintiff was able to drive to her appointments including to the "city" 50 miles one way once a week (Tr. at 91). She leaves her home every day for a few hours to do chores (Tr. at 91).

**B.    SUMMARY OF TESTIMONY**

During the October 16, 2007, hearing, plaintiff testified; and Barbara S. Myers, a vocational expert, testified at the request of the ALJ.

**1.    Plaintiff's testimony.**

At the time of the hearing, plaintiff was 39 years of age and is currently 41 (Tr. at 474). Plaintiff has not performed any work for pay or for profit since her alleged onset date of June 1, 2004 (Tr. at 474). She has been supported by her roommate and her family (Tr. at 474).

Plaintiff earned a college degree in Agricultural Business in 1991 (Tr. at 475). Plaintiff worked three summers at a Breed Publication Magazine, but other than that has not worked in the area of agricultural business (Tr. at 475). Plaintiff can use a computer and she can drive a car (Tr. at 477). In the year

6

previous, the longest distance she had driven was 100 miles (Tr. at 477).

Plaintiff cannot stand at the sink to do dishes, but she can stand for a half an hour when she shops at Wal-Mart (Tr. at 478). Plaintiff could walk a mile if she had to (Tr. at 478). She could lift 50 pounds one time (Tr. at 478). She could occasionally lift 35 to 40 pounds (Tr. at 478). Plaintiff can sit for about an hour before she has to stand up (Tr. at 479). She can bend over, squat, and climb steps (Tr. at 479). She has no difficulty breathing, seeing, hearing, or speaking (Tr. at 479). She sometimes has difficulty keeping her train of thought and understanding (Tr. at 479).

Plaintiff has been diagnosed with depression and fibromyalgia (Tr. at 480). In 2001 she had a procedure done on her heart for an irregular beat (Tr. at 480). She has not required any other procedures on her heart since then (Tr. at 480).

Plaintiff tries to go to sleep around midnight (Tr. at 480). Sometimes it takes her until six or seven in the morning to fall asleep (Tr. at 481). She gets up when she wakes up, around 3:00 in the afternoon (Tr. at 480). She takes Trazodone to help her sleep, and it helps some (Tr. at 481). She walks around some as exercise for her fibromyalgia (Tr. at 481).

7

Plaintiff lies around a lot, and she watches television (Tr. at 483).  She does not wash dishes, sweep, or mop (Tr. at 483). Her back and neck hurt when she does dishes, and she does not feel up to sweeping or mopping (Tr. at 484).  If she is up to it, she will take care of her pigs (Tr. at 483).  She takes care of ten to 12 pigs three or four days per week (Tr. at 483, 485). She throws a bucket of feed over the fence (Tr. at 485).  The bucket weighs 25 to 30 pounds (Tr. at 486).  She stated that the pigs belong to her nieces and nephews (Tr. at 483).  Some of the pigs are on plaintiff's property, and the others are on her parents' property about a quarter of a mile away (Tr. at 483). Her nieces and nephews live in Kansas City (Tr. at 484).

Plaintiff plays on a dart league in Kansas City once a week (Tr. at 484).  The games last about two hours (Tr. at 487). Plaintiff lives 45 miles from Kansas City (Tr. at 485).  She went to the State Fair in Sedalia three times in 2007 (Tr. at 486). Plaintiff goes to a casino in Kansas City to gamble once a month to once a week (Tr. at 486-487).  She spends a couple hours at the casino each time she goes (Tr. at 487).

Plaintiff's doctor told her to try to get some activity every day (Tr. at 488).  The only walking plaintiff does is to the mailbox, which is about 50 to 60 yards away (Tr. at 488).

Case 5:08-cv-06062-REL   Document 15   Filed 08/27/09   Page 8 of 54

Plaintiff last consumed alcohol in August 2007 (about two months before the administrative hearing) (Tr. at 481). On that occasion, she drank ten to 12 beers (Tr. at 481-482). That was about the fourth time in 2007 that plaintiff had consumed alcohol (Tr. at 482). On each occasion, she drank about ten to 12 beers (Tr. at 482). She has never participated in an alcohol treatment program (Tr. at 482).

**2. Vocational expert testimony.**

Vocational expert Barbara S. Myers testified at the request of the Administrative Law Judge. The vocational expert testified that plaintiff's past relevant work as a desktop publisher is a sedentary, skilled job with an SVP level of six[1] (Tr. at 490).

---

[1]"Specific Vocational Preparation" level. Specific Vocational Preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. This training may be acquired in a school, work, military, institutional, or vocational environment. It does not include the orientation time required of a fully qualified worker to become accustomed to the special conditions of any new job. Specific vocational training includes: vocational education, apprenticeship training, in-plant training, on-the-job training, and essential experience in other jobs. Specific vocational training includes training given in any of the following circumstances:
a. Vocational education (high school; commercial or shop training; technical school; art school; and that part of college training which is organized around a specific vocational objective);
b. Apprenticeship training (for apprenticeable jobs only);
c. In-plant training (organized classroom study provided by an employer);
d. On-the-job training (serving as learner or trainee on the job under the instruction of a qualified worker);

The first hypothetical involved a person who could stand and walk two to four hours per day; sit six hours per day; lift 20 pounds occasionally and ten pounds frequently; occasionally bend, twist, squat, climb, and kneel; and could do very little crawling or crouching (Tr. at 490). The person should do no work with the public but could work with coworkers and supervisors (Tr. at 491). The vocational expert testified that plaintiff could not return to her past relevant work as she performed it, because she talked to advertisers (Tr. at 491). However, she could do the job as it is typically performed, i.e., without contact with advertisers (Tr. at 491). There are 200 desktop publishing jobs in Missouri and 16,000 in the country (Tr. at 491). Reducing that number by 25 percent to eliminate the positions that require contact with advertisers would make the availability 150 jobs in Missouri and 12,000 jobs in the country (Tr. at 491).

The ALJ amended the hypothetical to require that the person be limited to simple tasks only, and she could stand for 30 minutes at a time maximum (Tr. at 492). The vocational expert testified that such a person could be a folding machine operator, with 1,000 jobs in Missouri and 70,000 in the nation, or she

---

e. Essential experience in other jobs (serving in less responsible jobs which lead to the higher grade job or serving in other jobs which qualify).

A specific vocational preparation level of 6 means over one year up to and including two years. <u>Dictionary of Occupational Titles</u>, Appendix C.

10

could be a photo copy machine operator with 1,000 in Missouri and 35,000 in the country (Tr. at 492). Finally, she could be a small parts assembler, with 4,000 jobs in Missouri and 170,000 in the country (Tr. at 492). Those jobs are all light and unskilled (Tr. at 492). The person could also perform the following sedentary, unskilled jobs: document preparer, with 1,000 in Missouri and 140,000 nationally; optical goods processor with 1,000 in Missouri and 60,000 nationally; hand packager with 1,000 in Missouri and 50,000 in the country (Tr. at 493).

The vocational expert testified that a person who needed to lie down 2/3 of the day could not work (Tr. at 494). A person could miss a maximum of one to two days per month, or 12 to 15 days per year (Tr. at 494). Anything more would be unacceptable (Tr. at 494).

C. *SUMMARY OF MEDICAL RECORDS*

On December 17, 1999, plaintiff saw Christopher Trimble, M.D. (Tr. at 235). She was having problems with her medication for a heart rate irregularity.[2] Plaintiff denied any other

---

[2]Plaintiff suffered from supraventricular tachycardia ("SVT"). In supraventricular tachycardia, the heart rate is sped up by an abnormal electrical impulse starting in the atria. The heart beats so fast that the heart muscle cannot relax between contractions. When the chambers do not relax, they cannot contract strongly or fill with enough blood to satisfy the body's needs. Because of the ineffective contractions of the heart, the brain does not receive enough blood and oxygen which can cause light-headedness, dizziness, or syncope (feeling like one might

problems.  She denied depression, anxiety, or any other
psychiatric type symptomatology.

On January 19, 2001, plaintiff saw Dr. Trimble (Tr. at 232).
She complained of difficulty breathing and tightness in her
chest.  "Has a history of fibromyalgia".  Plaintiff's exam was
normal except for abdominal pain in the epigastric area,
headache, and lower back pain.  He assessed fibromyalgia and a
probable viral infection.  This is the first time Dr. Trimble
ever assessed fibromyalgia.  There are no findings of tenderness
in the record on this date or on any other date prior to this
appointment.

On July 21, 2001, Dr. Trimble examined plaintiff (Tr. at
227).  This was approximately five weeks after plaintiff's
radiofrequency ablation.  Despite a normal physical exam, Dr.
Trimble assessed fibromyalgia.

On September 17, 2001, Dr. Trimble examined plaintiff (Tr.
at 226).  Her exam was normal, strength was 5/5 throughout, no
areas of weakness, normal coordination.  He noted no tenderness

---

faint).  Plaintiff underwent a radiofrequency ablation on June
11, 2001, and had no further occurrences of SVT. Radiofrequency
ablation is a relatively non-invasive procedure that involves
inserting catheters -- narrow, flexible wires -- into a blood
vessel, often through a site in the groin or neck, and winding
the wire up into the heart.  Once the faulty cells are
identified, energy is used to destroy a small amount of tissue,
ending the disturbance of electrical flow through the heart and
restoring a healthy heart rhythm.

anywhere.  He assessed fibromyalgia.

On November 30, 2001, Dr. Trimble examined plaintiff and found tenderness in her thigh and very minimal tenderness in her knee cap (Tr. at 225).  The rest of her exam was normal.  He assessed fibromyalgia.

On December 27, 2002, plaintiff saw Dr. Trimble (Tr. at 221).  He noted that she had gained 40 pounds in the past year. Her physical exam was normal.  He assessed fibromyalgia and chronic fatigue.  He had a long conversation with her about fibromyalgia, the need for physical activity, good sleep patterns, and healthy exercise and eating habits.  "Patient is not interested in doing much of these despite the fact it's all hope for getting better."  Dr. Trimble recommended that plaintiff exercise at least a half hour each day and do her normal chores and other activities on top of that. He told her to stop eating so many sweets.  Plaintiff admitted that she only wanted to eat sweets lately.

On June 10, 2003, plaintiff saw Dr. Trimble (Tr. at 220). He noted that plaintiff had been denied disability; that she was trying to get diagnosed as disabled "via her fibromyalgia."  Dr. Trimble wrote that he was not sure plaintiff was completely disabled, but that she could not do her current job.  Plaintiff was out of all of her medications and said she could not afford

13

to get any of them.  Plaintiff's physical exam was normal.  Dr.
Trimble noted that she appeared sad and had somewhat of a flat
affect, but she denied significant depression.  He assessed
depression, fibromyalgia, chronic pain, and "patient attempting
to be disabled." He gave her some samples of her medications.

On November 4, 2003, plaintiff saw Dr. Trimble (Tr. at 219).
Plaintiff complained of arm pain from practicing darts.
Plaintiff had difficulty raising her shoulders, she had spasm and
tenderness "everywhere".  Plaintiff continued to gain weight,
"not doing much in the way [of] aerobic exercise".  Dr. Trimble
assessed fibromyalgia, excess fatigue, and weight gain.  He told
her to walk daily for exercise.

On December 9, 2003, plaintiff saw Dr. Trimble for arm pain
(Tr. at 217, 219).  Plaintiff bothered her arm playing darts.  It
hurt all the time and bothered her at night.  Plaintiff continued
to have profound fatigue.  Her sleep apnea test was negative.
Plaintiff's physical exam was normal except diffuse tenderness in
her right arm.  She had no point tenderness.  He assessed
fibromyalgia, excessive weight gain, fatigue, right arm probable
tendinitis.  He told her to schedule an x-ray of her arm.  He
told her to reduce her Paxil dosage due to her weight gain
(plaintiff's weight was 206).

14

On January 13, 2004, plaintiff saw Dr. Trimble (Tr. at 216).
Plaintiff complained that she was more depressed. She requested a
stronger dose of Paxil, but she had run out of her Paxil prior to
this appointment.  Plaintiff had a small mass on her arm that was
tender.  She complained of continued chronic pain and fatigue.
Her physical exam was normal other than complaints of right arm
pain.  Dr. Trimble assessed fibromyalgia, excessive weight gain
(plaintiff had lost two pounds since her last appointment),
tendinitis in her right arm, fatigue, and worsening depression.
Dr. Trimble recommended that plaintiff resume her Paxil at the
same dose.  She was prescribed Wellbutrin XL, Trazodone, and
Bextra.  He referred her to an orthopedic surgeon and told her to
stop smoking.  He told her to see her psychiatrist as soon as
possible.

On February 10, 2004, plaintiff saw Dr. Trimble (Tr. at
215). She complained of more frequent headaches.  Neither
plaintiff nor her partner could answer any questions about what
started the headaches, how painful they were, how long they
lasted, or what made them go away.  Plaintiff's physical exam was
normal.  Dr. Trimble noted that plaintiff was not depressed and
was more energetic than he had seen her previously.  Dr. Trimble
assessed fibromyalgia, weight gain (plaintiff's weight was up 1/2
pound), fatigue, tendinitis, chronic daily headaches, and

15

depression.

On March 29, 2004, plaintiff saw Dr. Trimble for a follow up on her fibromyalgia (Tr. at 214). Plaintiff decreased her Trazodone on her own because she felt groggy in the morning. "She has not yet seen her psychiatrist unfortunately." Plaintiff's physical exam was normal. Her belly button was normal; however, she told Dr. Trimble that she had recently suffered bleeding from her belly button after lifting some pails to feed the pigs. Dr. Trimble assessed fibromyalgia, bleeding from the umbilicus, and sleep disorder. He told her to continue taking Trazodone and return in three months. He recommended she see a general surgeon about her umbilicus. "It is such a funny story and her umbilicus is otherwise intact. There must be some sort of irritation and she will try some over the counter yeast cream for that but I would like to make sure there is no anatomic abnormality."

On April 29, 2004, plaintiff saw Dr. Trimble due to coughing (Tr. at 213). Plaintiff continued to smoke. Plaintiff's exam was normal. "Patient appears well." Dr. Trimble assessed viral upper respiratory infection, tobacco abuse, and fibromyalgia. He told her to "push activity" to keep her strength up and to stop smoking.

June 1, 2004, is plaintiff's alleged onset date.

On November 15, 2004, plaintiff saw Dr. Trimble (Tr. at 212). "Patient unable to get disability for her fibromyalgia. She needs to smoke. She is no longer drinking any alcohol." Plaintiff reported getting a lot of headaches, pain in her hips and knees, and increased depression. Plaintiff's physical exam was normal with normal range of motion. Dr. Trimble assessed fibromyalgia, depression with mild suicidal thoughts without true ideation, and headaches. He referred her to Tri-County Mental Health. "I feel she is probably more frustrated than truly suicidal." He recommended an MRI due to plaintiff's headaches.

On November 29, 2004, plaintiff saw Dr. Trimble for a follow up (Tr. at 211). Plaintiff reported continuing to smoke but was not using alcohol. Her physical exam was normal. Dr. Trimble assessed fibromyalgia and "continued daily headaches". He told her he would discharge her if she did not get a follow up with a psychiatrist, and she needed to see a dentist soon. "Strongly encouraged to stop smoking." He recommended an MRI due to her recurring headaches.

Plaintiff saw Dr. Trimble on January 18, 2005 (Tr. at 210). Plaintiff had been having pain and was taking Bextra and Advil together.[3] Plaintiff requested stronger pain medication. Plaintiff's exam was normal. Dr. Trimble assessed fibromyalgia,

---

[3]Both are non-steroidal anti-inflammatories.

sinusitis, constipation, chronic pain, tobacco abuse, and anemia. Plaintiff was given samples of MiraLax (a laxative) and was told to take Senokot-s for her constipation.

On January 26, 2005, plaintiff was seen at North Central Missouri Mental Health Center (Tr. at 379-386). During her initial interview, she stated that she had a recent bankruptcy and was trying to get disability. "The client stated she loves to go to the state fair, that she lives for that, and at that point she will show her pigs and sell stock. In the past when she was healthy, she used to travel to other states to manage the breeding stock, and she would like to turn her hog raising business into a profitable enterprise instead of a losing proposition, as it is now, but raising breeding stock and being able to purchase the right pig semen and so forth so she can have really good hogs. She stated her father in the past was known throughout the region for having top notch hogs, and that hers are not as good as his, which is because of a lack of funds."

On February 4, 2005, plaintiff saw Mary Sue Breeze, LPN, CSW, in connection with her mental health treatment which began on January 26, 2005 (Tr. at 377, 378). "She reports that she has not refrained from gambling or drinking. She does drink on a semi-regular basis. . . . [S]he does take her medications daily as prescribed. She denies any side effects. She reports that

18

she has a weird schedule for her sleep because of her significant other's job. She stays up until she gets home; therefore, her sleep pattern is not a regular sleep pattern."

On February 25, 2005, plaintiff saw Mary Sue Breeze, LPN, CSW, in connection with her mental health treatment (Tr. at 372-373). Plaintiff told Ms. Breeze that she takes care of her hogs on a daily basis. She also stated that her grandmother helps her financially, and that if her grandfather knew he would be upset. "She does not have a future plan at this time. She is counting on getting the disability, so she has not been able to plan on anything else. I understand her frustration concerning the disability, but she continues to plan on this for her future."

On March 4, 2005, plaintiff saw Mary Sue Breeze, LPN, CSW, in connection with her mental health treatment (Tr. at 370-371). Plaintiff told Ms. Breeze that "Sue is the only one at this time that is working and bringing in a paycheck. She reports her grandmother has been helping them out a lot. Her grandfather does not know that, and if he knew that he would be very upset, so she is wanting to get on social security disability as soon as she can."

On March 7, 2005, plaintiff saw Dr. Trimble (Tr. at 209). Plaintiff had lost her prescription for Senokot (brand name for senna, a laxative) and was taking over-the-counter senna instead.

19

Plaintiff was not taking much ibuprofen or Aleve, but she was in pain "all the time". She said she needed Lortab[4] four times per day and also needed Norflex (muscle relaxer). Plaintiff reported that she had pain in her neck, knees, ankles, legs, and arms. She continued to smoke but denied alcohol use. Plaintiff's exam was normal. She appeared tired, down and quiet. "She thinks more pain medication is the solution." Dr. Trimble assessed, "Fibromyalgia. Chronic pain. Chronic tobacco abuse. Anemia. History of SVT resolve status post ablation. Depression. Constipation." Dr. Trimble wrote, "Long discussion with patient. Chronic narcotics are not acceptable for this condition. At most 15 pills of Lortab to last entire month. No refills are given."

On March 11, 2005, plaintiff saw Mary Sue Breeze, LPN, CSW, in connection with mental health treatment (Tr. at 369). Plaintiff told Ms. Breeze that "Sue is the only one in the household that works because [plaintiff] takes care of the pigs and things on the farm, and Sue works for a job in Kansas City, so the only income they have is what Sue brings in or what [plaintiff] gets when she sells one of the hogs. . . . She stays up until her significant other [who works at a casino in Kansas City] gets off work and then sleeps until two or three in the afternoon."

---

[4]Acetaminophen (Tylenol) and hydrocodone (narcotic).

Case 5:08-cv-06062-REL   Document 15   Filed 08/27/09   Page 20 of 54

On March 22, 2005, Dr. Trimble wrote a letter to whom it may concern (Tr. at 391-392). The letter states in part as follows:

Michelle Gentry . . . developed SVT in April of 1999. Before that she had been a functional employee at her job. After she developed the initial symptoms she was worked up for multiple things including mononucleosis, anemia, recurrent pharyngitis and other issues. She is still having problems with light headiness [sic] and dyspnea. This was initially felt to be secondary to side effects. Eventually, we finally sent her for ablation of the area of the SVT and we were able to discontinue most of her medications. Unfortunately, she did not improve. She was still having significant problems with disequilibrium and severe fatigue. Eventually, we did send her to a rheumatologist because of her complaints of total body pain and fatigue and she was diagnosed with fibromyalgia by Dr. Ann Warner on 6/22/2000.[5] . . . Since that time, we have had numerous unsuccessful attempts to get her back to work. We worked very hard to get her alcohol consumption down and we were able to eliminate it but it did not help her symptoms. Multiple attempts of improving her sleeping have been tried and they have improved her sleeping but without improvement of her fatigue. Unfortunately, she continues to smoke. She has had some problems with increasing depression that have been handled by her psychiatrist and our current matters of worsening fatigue probably brought on by reflux causing a [sic] iron deficiency anemia. This is currently under treatment. I am doubtful that the treatment of her anemia will cause a significant improvement in her fatigue and work capacity.

In summery [sic], Michelle Gentry has classic fibromyalgia. This is one of the more [sic] severe forms I've ever seen taking basically a healthy young person who is capable of working a normal schedule and reducing her to somebody who has marked difficulties in maintaining her usual activity of daily living activities such as cooking, cleaning and housework. Unfortunately, as you are well aware fibromyalgia does suffer from a lack of objective criteria by which it can be measured. Rest assured, I have never seen Michelle appear as if she could undertake any sort of

---

[5]Dr. Warner's medical records do not appear in this case file.

regular working scheduling in the last 5 years. It is
difficult to imagine her having any sort of gainful
employment that is more than just a few hours per week.

That same day Dr. Trimble completed a Residual Functional
Capacity Assessment (Tr. at 312-315). He found that plaintiff
can lift ten pounds frequently and up to 50 pounds at one time;
can sit for one hour at a time and for eight hours per day; and
can stand or walk for an hour at a time and for a total of four
hours per day. He was asked how many hours total plaintiff needs
to lie down, with the choices being less than one hour, one hour,
two hours, three hours, four hours, or more than four hours. He
circled "less than one hour." He found that plaintiff could not
push or pull arm or leg controls repeatedly with any extremity,
but that she could use her arms repeatedly for grasping, fine
manipulation, repetitive motions, and for bilateral manual
dexterity. He found that plaintiff could never bend, squat,
stoop, crouch, crawl, or kneel. He found that she can
occasionally climb, reach, or maintain her balance. He found
that she had a severe limitation in being around moving
machinery; a moderate limitation in driving automotive equipment;
and a mild limitation against unprotected heights, humidity and
temperature changes, and exposure to dust and fumes. When asked
if he believes plaintiff's complaints of pain, he checked, "Yes."
When asked if there was objective evidence demonstrating a

22

condition which could reasonably be expected to give rise to this degree of pain, he checked, "No." When asked what objective findings there were of such pain, he wrote, "diagnosis of fibromyalgia, chronic [illegible] headaches". Dr. Trimble wrote that plaintiff's degree of pain is occasionally debilitating, and that her fatigue is debilitating. He checked the following sensory problems: eye focusing problems, occasional dizziness, lethargy, and lack of alertness. He checked the following mental problems: depression, irritability, poor self esteem, short attention span, and memory problems. When asked to assess plaintiff's ability to deal with the stress of a low stress job, he checked "poor or none". He was asked how many absences per month she would experience due to her impairments or treatment, and he checked "more than three times a month". He noted that plaintiff has functioned at this level since "12/99".

On April 25, 2005, plaintiff saw Dr. Trimble for left breast pain and rib cage pain (Tr. at 208). "Unfortunately her symptoms continued to be nondescript and unhelpful." Plaintiff's exam was normal except for rib cage tenderness. Dr. Trimble assessed left breast and left anterior rib cage tenderness, fibromyalgia, tobacco abuse, and iron deficiency anemia.

On May 16, 2005, plaintiff saw Dr. Trimble for a general follow up (Tr. at 206). "She is sleeping generally OK for her.

23

We tried to get her off the senna however she is not having a good time with her bowels mostly because she takes only a couple Colace a day and forgets any extra. She is not on fiber supplementation." Although plaintiff complained of fatigue, she continued to smoke and was "not really interested in quitting." Plaintiff was assessed with "Constipation. Chronic narcotic use. Fibromyalgia." Dr. Trimble told plaintiff to take more of her stool softener, use a fiber supplement, and drink plenty of fluids.

On June 28, 2005, plaintiff saw Dr. Trimble due to swelling in her feet and fingers (Tr. at 205). Plaintiff stated that she was still suffering from constipation, she continued to smoke, but she was not drinking. "She is [seeing] a psychiatrist by the name of Dr. Wisdom. He felt that she was doing well currently and did not change anything. . . . She generally feels fairly good although continues to lack energy has poor sleep and continues to [hurt] all over." On exam, plaintiff had no edema in her extremities but had some "thickening" in the fingers and feet. Dr. Trimble assessed anemia of uncertain etiology, chronic fatigue and fibromyalgia, and chronic constipation. "She really needs to work on stopping her alcohol." Dr. Trimble told plaintiff to use a Fleet enema and Senokot (laxative) in addition to Colace (stool softener).

On July 12, 2005, Stanley Hutson, Ph.D., completed a
Psychiatric Review Technique (Tr. at 393-406).  He found that
plaintiff suffers from major depressive disorder, partner
relationship problems, and alcohol abuse in remission.  He found
that plaintiff has mild restriction of activities of daily
living; moderate difficulties in maintaining social functioning;
and moderate difficulties in maintaining concentration,
persistence, or pace.  In support, Dr. Hutson noted that
plaintiff had a DWI in 2002, and in June 2005 her primary care
physician indicated that plaintiff "really needs to work on
stopping her alcohol. Also tobacco abuse concern."  Dr. Hutson
wrote:

> Mental health intake 1/05 indicated claimant last worked in
> 1999.  She filed for bankruptcy in the recent past.  She is
> trying to get on disability. She has not had prior treatment
> for emotional problems, but was taking Paxil and Trazadone
> [sic].  She admits having DWI in 2002 and it has been
> resolved and she has her driver's license. She is interested
> in agriculture and livestock and shows hogs that she raises.
>
> Psychiatric evaluation 3/05 diagnosed MDD [major depressive
> disorder] and Alcohol Abuse in remission. She reported
> health problems since 1999, a DWI in 2002, and problems with
> gambling.  She has a college degree.  She was started on
> Cymbalta.  At followup 6/05 it was decided that her PCP
> would manage her medications because of her fibromyalgia
> treatment.

Dr. Hutson concluded with, "Claimant has a severe mental
disorder that does not meet or equate a listing."

Case 5:08-cv-06062-REL   Document 15   Filed 08/27/09   Page 25 of 54

That same day, Dr. Hutson completed a mental residual functional capacity assessment (Tr. at 407-409).  Dr. Hutson found that plaintiff was not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to understand and remember detailed instructions

- The ability to carry out very short and simple instructions

- The ability to carry out detailed instructions

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to make simple work-related decisions

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

He found that plaintiff was moderately limited in the following:

26

- The ability to maintain attention and concentration for extended periods

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to respond appropriately to changes in the work setting

Dr. Hutson concluded with, "She appears to be capable of appropriate social interactions and she could cope in a low stress and limited social interaction work setting."

On August 4, 2005, plaintiff saw Dr. Trimble complaining of swelling in her hands and feet (Tr. at 204). She complained of continuing constipation although she had several small stools per day. Plaintiff continued smoking but Dr. Trimble noted "no alcohol." He noted that she was tolerating Cymbalta well without any problems. He did not observe any swelling in her hands or feet; she had no swelling of her joints. He assessed subjective edema, constipation, intermittent reflux, and history of SVT and fibromyalgia. Plaintiff was told to continue on her current medications.

27

On August 29, 2005, plaintiff saw Dr. Trimble (Tr. at 203).
"Michelle fell after riding a pig in the Missouri state fair."
Plaintiff fell on her knee.  Plaintiff had full range of motion
in her knee.  Plaintiff's knee cap was normal, but with some
tenderness.  There was no swelling, and x-rays were normal.  She
was assessed with a left patella bruise.  Dr. Trimble recommended
anti-inflammatories.

On October 14, 2005, plaintiff had a colonoscopy due to her
history of passing bloody stools (Tr. at 427, 435).  The
colonoscopy was normal, but the doctor noted that the colon was
not adequately clean.  Dr. Laura Alba recommended repeating the
colonoscopy in five years, eating a  high fiber diet, and using a
stool softener.  That same day, plaintiff had an upper endoscopy
due to symptoms of gastroesophageal reflux disease (Tr. at 428,
433).  The exam was normal except the doctor discovered a 4 cm
hiatal hernia.

On December 5, 2005, plaintiff saw Dr. Trimble for a follow
up of fibromyalgia (Tr. at 202).  "Continues to manifest somewhat
depressed mood. She seems to be upset that perhaps [she] is not
going to be winning her disability case."  Dr. Trimble assessed:
"Esophageal reflux well controlled.  Sliding hiatal hernia with
symptoms. Chronic pain.  Fibromyalgia.  Constipation.
Depression."  He recommended she continue frequent follow up with

28

psychiatry and that she stop smoking.  He recommended she discuss
her hernia with a surgeon.

December 31, 2005, is plaintiff's last insured date.

On April 26, 2006, plaintiff saw Dr. Trimble for a pap, a
routine gynecological exam (Tr. at 200).  Plaintiff reported no
significant mood swings; her depression was unchanged; and she
was still suffering from depression, but her "other things" were
not any worse.  Dr. Trimble noted that plaintiff was in no
apparent distress, was alert and oriented.  Dr. Trimble assessed
constipation.  He was reluctant to put her on birth control for
irregular menses due to her smoking.

On August 1, 2006, plaintiff saw Dr. Trimble for problems
with constipation (Tr. at 199, 423-425).  She still had blood in
her stool.  Dr. Trimble wrote "colon[oscopy] 10/05 w/o good
prep".  Plaintiff reported drinking once per month, consuming 12-
15 beers per episode.  Dr. Trimble told her to stop using alcohol
or she could face acute liver failure.  Plaintiff reported that
she was doing much better on Cymbalta, and Dr. Trimble told her
she would have to discontinue the Cymbalta if she continued
drinking.  Plaintiff continued to smoke a half a pack of
cigarettes per day.  On exam Dr. Trimble observed that plaintiff
was alert and oriented times three, her mood and affect were
flat, she had fair insight and good judgment.  He assessed

29

hematochezia,[6] iron deficiency anemia, fibromyalgia, slow transit constipation, and alcohol dependence.

On September 5, 2006, plaintiff saw Dr. Trimble for constipation (Tr. at 420-422). He performed an exam, and found that her psychiatric exam was normal: "mental status: alert and oriented x 3; appropriate affect and demeanor". He assessed low back pain, slow transit constipation, and paresthesia. He recommended she do home back strengthening exercises, increase her physical activity, lose weight and stop smoking.

On December 27, 2006, plaintiff saw Dr. Trimble for a follow up on hypercholesterolemia (Tr. at 457-458). "Patient to be evaluated for hypercholesterolemia, date of diagnosis 2006. Current treatment includes none. Compliance with treatment has been fair. She specifically denies associated symptoms, including muscle pain, headache and weakness. Frequently consumed foods include fast food and fried foods." Plaintiff continued to smoke a half a pack of cigarettes per day. On exam Dr. Trimble noted tenderness of the trochanter on both hips, and a normal psychiatric exam. He recommended she return in three months. He also told her to diet and exercise.

On March 16, 2007, plaintiff saw Joshua Niemann, M.D., an orthopedic specialist (Tr. at 463-464). Plaintiff complained of

---

[6]The passage of bright red, bloody stools.

hip pain for the past six months (or since approximately September 2006). "Her left hip is more painful than the right, and this does not significantly bother her during the day or limit her activities." All of plaintiff's x-rays were normal. Plaintiff was observed to be alert and oriented times three and responded appropriately to all questions. Plaintiff had full range of motion of both hips with no pain, but she did have tenderness. Dr. Niemann assessed bilateral trochanteric bursitis and gave her a steroid injection in her left hip. He recommended she do stretching exercises.

On March 29, 2007, plaintiff saw Dr. Trimble for a follow up visit to address plaintiff's anemia (Tr. at 449-451). He noted she was stable off her iron. "Concerning hypercholesterolemia, date of diagnosis 2006. Current treatment includes none. Compliance with treatment has been fair. She specifically denies associated symptoms, including muscle pain, headache and weakness. Frequently consumed foods include fast food and fried foods." On exam Dr. Trimble observed tenderness of the trochanter on both hips. Plaintiff was alert and oriented times three and had appropriate affect and demeanor. Dr. Trimble ordered blood work and told plaintiff to get more exercise.

On April 27, 2007, plaintiff saw Joshua Niemann, M.D., an orthopedic specialist (Tr. at 462). "She says her leg pain is

31

improved significantly, and she has no pain whatsoever.  She
continues to have a little bit of pain in her right greater
trochanteric bursa, but not bad enough so that she would like
anything done about it."  His impression was "bilateral
trochanteric bursitis, with left hip resolving after cortisone
injection."  She was told to continue with her activities as
desired.

On July 18, 2007, plaintiff saw Dr. Trimble, complaining of
elbow and shoulder pain for the past few months, aggravated by
"over exercise" (Tr. at 442-445). On exam, plaintiff was normal
including her neck, musculoskeletal system (with normal gait),
and psychiatric exam (alert and oriented times three, appropriate
affect and demeanor).  Plaintiff had full active and passive
range of motion in flexion, extension, abduction, adduction,
internal and external rotation; and she had 5/5 muscle strength.
The only abnormality found was pain in plaintiff's elbow.  Dr.
Trimble prescribed Lortab (a narcotic) and Naprosyn (a non-
steroidal anti-inflammatory) and recommended plaintiff get a
tennis-elbow splint.

## V.  *FINDINGS OF THE ALJ*

Administrative Law Judge Susan Blaney entered her opinion on
December 27, 2007.  The ALJ first found that plaintiff met the
disability insured status through December 31, 2005 (Tr. at 16,

32

17).

Step one.  Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 18).  Although the medical records establish that plaintiff repeatedly admitted raising and selling hogs for money, those earnings were not reported (Tr. at 18).  The ALJ gave plaintiff the benefit of the doubt and found that she had not engaged in substantial gainful activity (Tr. at 18).

Step two.  Plaintiff suffers from fibromyalgia; mild obesity; supraventricular tachycardia, greatly improved well prior to the amended alleged onset date of disability due to ablation therapy with essentially resolved symptomatology thereafter; a hiatal hernia; depression; an alcohol dependence disorder; episodic iron deficiency anemia; gastroesophageal reflux disease; episodic constipation; and mild degenerative changes of the sacroiliac joints, which combine to establish a severe impairment (Tr. at 18).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 19).

Step four.  Plaintiff's allegations of disabling symptoms are only partially credible (Tr. at 31).  Plaintiff retains the residual functional capacity (when sober) to lift, carry, push or pull 20 pounds occasionally and ten pounds frequently; stand or

33

walk for two to four hours per day; sit for six to eight hours per day; may only occasionally bend, twist, squat, climb, or kneel; may do very little crawling or crouching; may not work with the public but is able to work appropriately with co-workers and supervisors (Tr. at 20). With this residual functional capacity, plaintiff is able to return to her past relevant work as a desktop publisher as that job is typically performed in the economy, i.e., without customer service (Tr. at 31-32).

Step five. Although the ALJ found plaintiff not disabled at the fourth step of the sequential analysis, she alternatively found plaintiff not disabled at the fifth step (Tr. at 32-34). The ALJ considered an even more restrictive residual functional capacity, i.e., where plaintiff could only stand for 30 minutes at a time and that she perform only simple tasks (Tr. at 32). Even with that more restrictive residual functional capacity, the ALJ found that plaintiff could be a folding machine operator with 1,000 positions in the state and 70,000 nationally, along with five other occupations, all of which exist in significant numbers in the local and national economies (Tr. at 32).

## VI. *OPINION OF PLAINTIFF'S TREATING PHYSICIAN*

Plaintiff argues that the ALJ erred in discounting the opinion of plaintiff's treating physician, Christopher Trimble, M.D. The opinion at issue is the one rendered on March 22, 2005,

34

when Dr. Trimble wrote a letter to whom it may concern (Tr. at 391-392). Again, the letter states in part as follows:

> Michelle Gentry . . . developed SVT in April of 1999. Before that she had been a functional employee at her job. After she developed the initial symptoms she was worked up for multiple things including mononucleosis, anemia, recurrent pharyngitis and other issues. She is still having problems with light headiness [sic] and dyspnea. This was initially felt to be secondary to side effects. Eventually, we finally sent her for ablation of the area of the SVT and we were able to discontinue most of her medications. Unfortunately, she did not improve. She was still having significant problems with disequilibrium and severe fatigue. Eventually, we did send her to a rheumatologist because of her complaints of total body pain and fatigue and she was diagnosed with fibromyalgia by Dr. Ann Warner on 6/22/2000. . . . Since that time, we have had numerous unsuccessful attempts to get her back to work. We worked very hard to get her alcohol consumption down and we were able to eliminate it but it did not help her symptoms. Multiple attempts of improving her sleeping have been tried and they have improved her sleeping but without improvement of her fatigue. Unfortunately, she continues to smoke. She has had some problems with increasing depression that have been handled by her psychiatrist and our current matters of worsening fatigue probably brought on by reflux causing a [sic] iron deficiency anemia. This is currently under treatment. I am doubtful that the treatment of her anemia will cause a significant improvement in her fatigue and work capacity.
>
> In summery [sic], Michelle Gentry has classic fibromyalgia. This is one of the more [sic] severe forms I've ever seen taking basically a healthy young person who is capable of working a normal schedule and reducing her to somebody who has marked difficulties in maintaining her usual activity of daily living activities such as cooking, cleaning and housework. Unfortunately, as you are well aware fibromyalgia does suffer from a lack of objective criteria by which it can be measured. Rest assured, I have never seen Michelle appear as if she could undertake any sort of regular working scheduling in the last 5 years. It is difficult to imagine her having any sort of gainful employment that is more than just a few hours per week."

35

On that same day, Dr. Trimble completed a Residual Functional Capacity Assessment (Tr. at 312-315). He found that plaintiff can lift ten pounds frequently and up to 50 pounds at one time; can sit for one hour at a time and for eight hours per day; and can stand or walk for an hour at a time and for a total of four hours per day. He was asked how many hours total plaintiff needed to lie down, with the choices being less than one hour, one hour, two hours, three hours, four hours, or more than four hours. He circled "less than one hour." He found that plaintiff could not push or pull arm or leg controls repeatedly with any extremity, but that she could use her arms repeatedly for grasping, fine manipulation, repetitive motions, and for bilateral manual dexterity. He found that plaintiff could never bend, squat, stoop, crouch, crawl, or kneel. He found that she could occasionally climb, reach, or maintain her balance. He found that she had a severe limitation in being around moving machinery; a moderate limitation in driving automotive equipment; and a mild limitation against unprotected heights, humidity and temperature changes, and exposure to dust and fumes.

When asked if he believes plaintiff's complaints of pain, he checked, "Yes." When asked if there was objective evidence demonstrating a condition which could reasonably be expected to give rise to this degree of pain, he checked, "No." When asked

36

what objective findings there were of such pain, he wrote,
"diagnosis of fibromyalgia, chronic [illegible] headaches".  Dr.
Trimble wrote that plaintiff's degree of pain is occasionally
debilitating, and that her fatigue is debilitating.  He checked
the following sensory problems:  eye focusing problems,
occasional dizziness, lethargy, and lack of alertness.  He
checked the following mental problems:  depression, irritability,
poor self esteem, short attention span, and memory problems.
When asked to assess plaintiff's ability to deal with the stress
of a low stress job, he checked "poor or none".  He was asked how
many absences per month she would experience due to her
impairments or treatment, and he checked "more than three times a
month".  He noted that plaintiff has functioned at this level
since "12/99".

A treating physician's opinion is granted controlling weight
when the opinion is not inconsistent with other substantial
evidence in the record and the opinion is well supported by
medically acceptable clinical and laboratory diagnostic
techniques.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005);
Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ
fails to give controlling weight to the opinion of the treating
physician, then the ALJ must consider several factors to
determine how much weight to give to the opinion of the treating

Case 5:08-cv-06062-REL   Document 15   Filed 08/27/09   Page 37 of 54

physician:  (1) the length of the treatment relationship and the frequency of examinations, (2) nature and extent of the treatment relationship, (3) supportability by medical signs and laboratory findings, (4) consistency of the opinion with the record as a whole, and (5) any other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).

**1.     Length of treatment relationship and frequency of examinations.** Dr. Trimble's treatment of plaintiff spans years and, as plaintiff pointed out, consists of approximately 52 visits.  This factor supports giving controlling weight to Dr. Trimble's opinion.

**2.     Nature and extent of treatment relationship.**[7]  Dr. Trimble has provided treatment for plaintiff's fibromyalgia and mental impairment by giving her prescriptions.  His examinations, which will be discussed at greater length below, were essentially normal and did not include any of the tender point exams which are traditional for a diagnosis of fibromyalgia.  He did not perform any mental status exams.  He did not order any fibromyalgia or mental impairment tests from specialists or

---

[7]"Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories."  20 C.F.R. § 404.1527.

independent laboratories.  He did, however, direct that plaintiff be treated by a psychiatrist; however, her treatment was returned to Dr. Trimble due to her simultaneous treatment for fibromyalgia.  Dr. Trimble did not provide any counseling services to aid in the treatment of plaintiff's mental impairment.  This factor, although not determinative by any means, does not support giving controlling weight to the opinion of Dr. Trimble.

**3.  Supportability by medical signs and laboratory findings.**[8]  Plaintiff argues that "Dr. Trimble has conducted as many examinations and taken as many histories as necessary to render his opinions."  This is true.  The number of exams has been many.  However, the examinations performed by Dr. Trimble were routinely normal.  Dr. Trimble rarely found any abnormality in plaintiff's physical exams, and any abnormalities were essentially unrelated to the impairments which plaintiff alleges cause her disability.  Dr. Trimble even admits in the Residual Functional Capacity Assessment that there was no objective evidence demonstrating a condition which could reasonably be expected to give rise to the degree of pain as alleged by

---

[8]"The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 404.1527.

plaintiff.

A review of the records shows that Dr. Trimble's assessments were almost exclusively a result of plaintiff's complaints:

- On July 21, 2001, he assessed fibromyalgia despite a normal physical exam.

- On September 17, 2001, he assessed fibromyalgia despite a normal physical exam, 5/5 strength throughout, no areas of weakness, normal coordination, and no tenderness anywhere.

- On December 27, 2002, he assessed fibromyalgia and chronic fatigue despite a normal exam. The notes reflect that he talked to plaintiff about healthy exercise and healthy eating and sleeping habits, but that she was "not interested in doing much of these".

- On June 10, 2003, he assessed fibromyalgia, depression, and chronic pain despite a normal physical exam.

- On November 4, 2003, he assessed fibromyalgia and excess fatigue after plaintiff complained of arm pain from practicing darts. She had spasm and tenderness "everywhere" but Dr. Trimble did not indicate where or whether this was his own finding on exam or whether this was plaintiff's allegation.

- On December 9, 2003, Dr. Trimble assessed fibromyalgia, fatigue and right arm tendinitis after a normal physical exam with the exception of tenderness in her right arm which she bothered playing darts.

- On January 13, 2004, Dr. Trimble assessed fibromyalgia, right arm tendinitis, fatigue, and worsening depression. Plaintiff's exam was normal but she had complained of being more depressed and having chronic pain and fatigue.

- On February 10, 2004, Dr. Trimble assessed fibromyalgia, fatigue, chronic daily headaches, and depression. This was after a normal physical exam, Dr. Trimble observed that plaintiff was not depressed, Dr. Trimble observed that plaintiff was more energetic than he had seen her previously, and neither plaintiff nor her partner could provide any details about plaintiff's headaches when asked.

40

- On March 29, 2004, Dr. Trimble assessed fibromyalgia and sleep disorder. This was despite a normal physical exam and plaintiff's statement that she had been lifting pails to feed her pigs.

- On April 29, 2004, plaintiff complained of coughing. Despite a normal exam and plaintiff's continued smoking, Dr. Trimble assessed upper respiratory infection and fibromyalgia.

- On November 15, 2004, Dr. Trimble assessed fibromyalgia, depression, and headaches. Plaintiff's exam was normal with normal range of motion. Plaintiff had reported a lot of headaches, increased depression, and pain in her hips and knees.

- On November 29, 2004, plaintiff's exam was normal. He assessed fibromyalgia and "continued daily headaches."

- On January 18, 2005, plaintiff's exam was normal. Dr. Trimble assessed fibromyalgia and chronic pain.

- On March 7, 2005, plaintiff's exam was normal but she reported pain in her neck, knees, ankles, legs, and arms. She requested narcotics. Dr. Trimble assessed fibromyalgia and chronic pain. He acknowledged that plaintiff believed more pain medication was the answer, but stopped short of acknowledging drug seeking behavior.

These are all of the relevant appointments plaintiff had with Dr. Trimble before he wrote the letter and completed that Residual Functional Capacity Assessment on March 22, 2005. Clearly Dr. Trimble's diagnoses were not supported by medical signs or laboratory findings. They were based on nothing more than plaintiff's complaints, and sometimes the diagnoses were made without plaintiff even complaining of symptoms related to the assessments. This factor weighs very heavily against giving

41

controlling weight to Dr. Trimble's opinion as written on March 22, 2005.

**4.   Consistency of the opinion with the record as a whole.**

The record reflects that Dr. Trimble's opinion on March 22, 2005, is inconsistent with the record as a whole.  On January 26, 2005 -- two months before the opinion at issue -- plaintiff told her mental health provider the following:

- She loves to go to the state fair, she lives for that, and at the fair she shows her pigs and sells stock.

- Plaintiff wanted to turn her "hog raising business" into a profitable enterprise instead of "a losing proposition as it is now" but that she needed money to buy the right pig semen in order to make her business profitable.

- She had recently filed for bankruptcy.

On February 4, 2005, about a month and a half before Dr. Trimble wrote the opinion at issue, plaintiff told her mental health provider that she had not refrained from gambling or drinking.  She reported drinking on a semi-regular basis.  This is completely contradictory to plaintiff's assertion to Dr. Trimble on her last visit with him that she had stopped using alcohol.  In fact, Dr. Trimble's notes do not otherwise mention any alcohol use for a significant amount of time prior to her statement to him that she had stopped using it.  This leads to the conclusion that Dr. Trimble's assessment of plaintiff's symptoms is based on his belief that her symptoms were caused

entirely by her impairments which did not include alcohol abuse.

On February 25, 2005, less than one month before Dr. Trimble rendered his opinion, plaintiff told her mental health provider that she was taking care of her hogs on a daily basis. She also revealed that her grandmother was helping her financially and that if her grandfather found out about that, he would be upset. Plaintiff refused to make plans for taking care of herself in the future, instead choosing to count on getting disability benefits.

On March 4, 2005, less than three weeks before Dr. Trimble rendered his opinion, plaintiff told her counselor that her grandmother was helping her out financially, that her grandfather would be very upset if he knew that, and that plaintiff wanted to get on disability "as soon as she can."

On March 7, 2005, just two weeks before Dr. Trimble wrote his opinion, plaintiff saw him and again denied any alcohol use. Clearly Dr. Trimble's opinion was based on false information from plaintiff.

Finally, on March 11, 2005, less than two weeks before Dr. Trimble wrote his opinion, plaintiff told her counselor that she stayed up until her partner got home from work, that her partner worked nights at a casino, and then plaintiff would sleep until

43

two or three in the afternoon.  This could explain Dr. Trimble's observation four days earlier that plaintiff "appeared tired".

In addition to being inconsistent with other records around the time the opinion was written, Dr. Trimble's March 22, 2005, opinion is contradictory to the other evidence which appears subsequently.  On May 16, 2005, plaintiff told Dr. Trimble that she was forgetting to take her stool softener and she was not on any fiber supplements, but she continued to ask for medication for constipation.  She complained of fatigue, but continued to smoke and was "not really interested in quitting."  On June 28, 2005, Dr. Trimble noted that according to Dr. Wisdom (plaintiff's psychiatrist), plaintiff was doing well.  Plaintiff said she generally felt fairly good.

In July 2005, Dr. Hutson found that plaintiff was capable of performing a low stress job with limited social interaction.  In August 2005, plaintiff fell on her knee while riding a pig at the state fair.  After her December 5, 2005, appointment with Dr. Trimble, she did not seek any medical care for nearly five months, suggesting her symptoms were not as bad as she claims.  On that visit, April 26, 2006, she reported no significant mood swings, and no worsening of any symptoms.  She was observed to be alert and oriented.  In August 2006, plaintiff admitted that she had continued to drink alcohol and continued to smoke.  She did

44

report much improvement with Cymbalta.

On September 5, 2006, Dr. Trimble recommended that plaintiff increase her physical activity. On December 27, 2006, plaintiff specifically denied muscle pain, headache, and weakness. In March 2007, plaintiff had a steroid injection in her hip which completely resolved her hip pain. In July 2007, plaintiff had a normal physical exam including normal musculoskeletal system, normal gait, and normal psychiatric exam. She had full active and passive range of motion in flexion, extension, abduction, adduction, internal and external rotation. She had 5/5 muscle strength.

Dr. Trimble's opinion is not only inconsistent with his own treatment records and with the other treatment records in the case file, it is also inconsistent with plaintiff's own testimony and the lack of medical complaints.

- Dr. Trimble wrote, "She is still having problems with light headiness [sic] and dyspnea." However, there is no complaint or finding of lightheadedness, dizziness, or dyspnea in any medical record subsequent to plaintiff's ablation in 2001.

- Dr. Trimble wrote, "She was still having significant problems with disequilibrium and severe fatigue." Again, there were no complaints of disequilibrium after plaintiff's 2001 ablation. Dr. Trimble never considered plaintiff's habit of staying up at night waiting for her partner to get home from work and sleeping most of the day as a cause of her severe fatigue, perhaps because plaintiff never told him she was doing that. In December 2002, he talked to plaintiff about the need to develop good sleep patterns, but he noted that she was not interested in that. In February

45

2005, plaintiff told her counselor that she had a very
irregular sleep pattern because she liked to stay up until
her partner got home from work.  When an impairment can be
controlled by treatment or medication, it cannot be
considered disabling.  <u>Wheeler v. Apfel</u>, 224 F.3d 891 (8th
Cir. 2000); <u>Kisling v. Chater</u>, 105 F.3d 1255 (8th Cir.
1997).  Failure to follow a prescribed course of remedial
treatment without good reason is grounds for denying an
application for benefits.  <u>Id</u>.; 20 C.F.R. § 416.930(b).
Plaintiff's lack of interest in improving her sleep patterns
in order to lessen her fatigue supports the ALJ's finding
that she is not disabled.

- ■ Dr. Trimble wrote that plaintiff was having "some problems
  with increasing depression".  However, he acknowledged that
  those problems were being handled by her psychiatrist.[9]  In
  addition, plaintiff did not see any doctor for seven months
  (from April 29, 2004, through November 15, 2004) at the
  beginning of her alleged onset date (June 1, 2004),
  indicating that her symptoms were not that bad.
  Furthermore, after her alleged onset date, plaintiff first
  complained of depression on November 15, 2004 (six and a
  half months after her alleged onset date).  She had recently
  learned of SSA's denial of her disability claim.  Dr.
  Trimble wrote, "I feel she is probably more frustrated than
  truly suicidal."  Dr. Trimble did not diagnose depression
  again until March 7, 2005; and even then, plaintiff did not

---

[9]Because Dr. Trimble did not treat plaintiff for depression
other than prescribing medication and directing her to see a
psychiatrist, the ALJ properly discounted his opinion in this
regard.  Dr. Trimble did not perform any mental health tests; he
provided no counseling.  "Generally, the more knowledge a
treating source has about your impairment(s) the more weight we
will give to the source's medical opinion. We will look at the
treatment the source has provided and at the kinds and extent of
examinations and testing the source has performed or ordered from
specialists and independent laboratories. For example, if your
ophthalmologist notices that you have complained of neck pain
during your eye examinations, we will consider his or her opinion
with respect to your neck pain, but we will give it less weight
than that of another physician who has treated you for the neck
pain. When the treating source has reasonable knowledge of your
impairment(s), we will give the source's opinion more weight than
we would give it if it were from a nontreating source."  20
C.F.R. § 404.1527.

46

complain of depression.  She complained of body pain and
requested more narcotics.  There were no further diagnoses
of depression prior to Dr. Trimble writing the letter and
Residual Functional Capacity Assessment at issue here.

- Dr. Trimble found that plaintiff could lift ten pounds
  frequently and up to 50 pounds at a time.  The ALJ found
  that plaintiff could lift ten pounds frequently and 20
  pounds occasionally, which is more restrictive than those
  found by Dr. Trimble.  Plaintiff testified that she could
  occasionally lift 35 to 40 pounds and could lift 50 pounds
  maximum.  Therefore, Dr. Trimble's findings were
  significantly more restrictive than what plaintiff admitted
  to.  This is irrelevant, however, since the ALJ's finding
  was that plaintiff was even more limited than she or Dr.
  Trimble claimed.

- Dr. Trimble found that plaintiff could sit for one hour at a
  time and for eight hours per day.  The ALJ found that
  plaintiff could sit for six to eight hours per day, which is
  essentially the same as that found by the ALJ.

- Dr. Trimble found that plaintiff could stand or walk for an
  hour at a time and for a total of four hours per day.  The
  ALJ found that plaintiff could stand or walk for two to four
  hours per day, which is essentially the same as Dr.
  Trimble's findings.  I also note that Dr. Trimble repeatedly
  told plaintiff to walk for exercise.  On December 27, 2002,
  he discussed with her the need for physical activity and
  healthy exercise.  He recommended she exercise for at least
  a half hour each day on top of her normal chores and other
  activities.  On November 4, 2003, he told plaintiff to walk
  daily for exercise.  On April 29, 2004, he told her to "push
  activity".

- Dr. Trimble found that plaintiff could never bend, squat,
  stoop, crouch, crawl, or kneel.  The ALJ found that
  plaintiff could occasionally bend or squat, and that she
  should do very little crawling or crouching.  As discussed
  above, Dr. Trimble's physical exams of plaintiff were almost
  exclusively normal, including normal range of motion and 5/5
  muscle strength.  Furthermore, plaintiff testified that she
  could bend, squat, climb steps and reach overhead.  Finally,
  the job the ALJ found that plaintiff could do requires no
  kneeling, no crouching, no crawling, and no climbing.

47

Therefore, Dr. Trimble's findings here are not only unsupported by the record, they are irrelevant to the outcome of this case.

- Dr. Trimble found that plaintiff could only occasionally climb, reach, and maintain her balance.  As mentioned above, plaintiff testified that she could climb and reach.  There is nothing in the record suggesting that plaintiff would have any difficulty maintaining her balance, as there is nothing in the record about "disequilibrium" subsequent to her 2001 ablation.

- Dr. Trimble found that plaintiff's degree of pain was "occasionally debilitating".  Once again, all of his physical exams spanning a several-year period were normal.  He acknowledged that there is no objective evidence demonstrating a condition which could reasonably be expected to give rise to the degree of pain plaintiff alleged.  He acknowledged in his medical records that plaintiff not only abused alcohol but continually sought higher doses of her medication and attempted to get him to prescribe more narcotics than he thought was safe or appropriate.  He recommended that she get regular exercise, lose weight, adopt a regular sleep routine, and eat healthy foods.  Plaintiff, however, was not interested in any of those recommendations, which suggests that her pain was not as bad as she alleged.

- Dr. Trimble found that plaintiff's fatigue was debilitating.  Yet, while Dr. Trimble was trying to get plaintiff to adopt healthy eating and sleeping habits, she acknowledged to him that she was only interested in eating sweets and was not interested in adopting a healthy sleeping routine. She told her therapist that she routinely stayed up very late waiting for her roommate to get home from work, then slept until mid-afternoon.  She also lied to Dr. Trimble about her alcohol use, making him believe that she was abstaining from alcohol when in reality she was using it "semi-regularly."

- Dr. Trimble found that plaintiff had eye focusing problems, occasional dizziness, lethargy, and lack of alertness.  Once again, there is no indication in the record at all that plaintiff ever even complained of dizziness or eye focusing problems after her 2001 ablation.  Plaintiff testified that she had no difficulty with her eyesight.  She reported to her therapist that she had no medication side effects.  In

48

every one of Dr. Trimble's medical reports, he noted that plaintiff was "alert and oriented times three". Therefore, his finding that plaintiff suffers from a lack of alertness is completely contradicted by his own medical records which span multiple years.

- Dr. Trimble found that plaintiff would miss more than three days per month due to her impairments or treatment. Clearly this finding did not come from plaintiff's treatment, as her visits to Dr. Trimble numbered two in the seven months of 2004 that she alleges she was disabled, and eight in 2005. During 2005 she had a colonoscopy on one occasion, and she saw a therapist multiple times.[10] As plaintiff was able to take care of her pigs on a daily basis, go gambling for several hours at a time up to once per week, play in dart leagues weekly, practice darts, travel regularly to Kansas City which is about an hour away from her home, and leave her home for several hours each day to perform chores, there is no evidence that plaintiff's impairment would interfere with her work attendance to the extent surmised by Dr. Trimble.

In addition to the above evidence which contradicts Dr. Trimble's opinion, I point out that there is nothing in the record as a whole which supports the extremely restrictive findings of Dr. Trimble in his March 22, 2005, assessment of plaintiff's abilities and limitations. Based on the above, I find that this factor weighs very heavily against giving controlling weight to Dr. Trimble's opinion as written on March 22, 2005.

---

[10]Many of these visits were at plaintiff's residence, which would not necessarily interfere with her work attendance. In any event, the medical visits do not amount to the "more than three days per month" Dr. Trimble found she would be likely to miss work.

**5.  Specialization of the doctor.**  Plaintiff acknowledges that Dr. Trimble is a family practitioner, not a rheumatologist or a psychiatrist.  This factor weighs against giving controlling weight to Dr. Trimble's March 22, 2005, opinion.

**6.  Other.**[11]  With respect to this factor, I simply point out a couple of observations which support the ALJ's decision not to give controlling weight to Dr. Trimble's March 22, 2004, opinion.  On June 10, 2003, Dr. Trimble wrote that he was not sure plaintiff was completely disabled, but that she could not do her "current job."  Plaintiff had not reported any earnings since 2001 -- two years before this medical record was written.

On January 13, 2004, Dr. Trimble, who had been prescribing antidepressants, told plaintiff she needed to see a psychiatrist as soon as possible.  Yet on November 29, 2004 -- more than ten months later -- she still had not seen a psychiatrist and he threatened to discharge her as a patient if she did not follow up with a psychiatrist.  During all of 2004, Dr. Trimble continued

_____

[11]"When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion."  20 C.F.R. § 404.1527.

to treat plaintiff's mental symptoms with nothing but medication. Plaintiff began seeing a psychiatrist and therapist in early 2005, but only after Dr. Trimble threatened to discharge her as a patient.

Finally, Dr. Trimble stated in his letter than plaintiff could not undertake any sort of regular working schedule, and could not have any sort of gainful employment beyond a few hours per week. A physician's conclusory statement of disability without supporting evidence does not overcome substantial medical evidence supporting the Commissioner's decision. <u>Loving v. Dept. of Health and Human Services</u>, 16 F.3d 967, 971 (8th Cir. 1994); <u>Browning v. Sullivan</u>, 958 F.2d 817, 823 (8th Cir. 1992). Further, an opinion by a doctor that a claimant cannot work is not a medical opinion. <u>House v. Astrue</u>, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination"); <u>Baker v. Barnhart</u>, 457 F.3d 882, 894 (8th Cir. 2006) (A physician's opinion regarding a claimant's ability to find work within a particular classification is not a "medical opinion"); <u>Smallwood v. Chater</u>, 65 F.3d 87, 89 (8th Cir. 1995) (An opinion as to whether a claimant can find work or be gainfully employed is outside the

province of medical doctors). See also 20 C.F.R. § 404.1527 ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (e)(1) and (e)(2) of this section", i.e., that a claimant is disabled, or that a claimant's impairment meets or equals a listed impairment.)

Based on all of the above, I find that the ALJ did not err in failing to give controlling weight to the opinion of Dr. Trimble as reflected in his letter and Residual Functional Capacity Assessment, both dated March 22, 2005; and plaintiff's motion for summary judgment on this basis will be denied.

## VII. ALJ'S DUTY TO CONTACT DR. TRIMBLE

Plaintiff argues that the ALJ created reversible error by failing to contact Dr. Trimble for clarification as to his March 22, 2005, opinion. Plaintiff cites SSR 96-5p which states as follows:

> Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion.

Clearly, as discussed above, the evidence does not support Dr. Trimble's opinion "on any issue reserved to the Commissioner", which would be whether plaintiff is disabled.

52

However, before an ALJ is required to contact the doctor, it must be shown that the ALJ "cannot ascertain the basis of the opinion from the case record". That is not the case here.

The Eighth Circuit, in <u>Goff v. Barnhart</u>, 421 F.3d 785, 791 (8th Cir. 2005), stated as follows:

> While the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required "to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." The Commissioner's regulations explain that contacting a treating physician is necessary only if the doctor's records are "inadequate for us to determine whether [the claimant is] disabled" such as "when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1512(e), 416.912(e). Here, the ALJ did not find the doctors' records inadequate, unclear, or incomplete, nor did it find the doctors used unacceptable clinical and laboratory techniques. Instead, the ALJ discounted the opinions because they were inconsistent with other substantial evidence. In such cases, an ALJ may discount an opinion without seeking clarification.

Similarly, the Eighth Circuit held as follows in <u>Hacker v. Barnhart</u>, 459 F.3d 934 (8th Cir. 2006);

> While the regulations provide that the ALJ should recontact a treating physician in some circumstances, 20 C.F.R. § 404.1512(e), that requirement is not universal. The regulations provide that the ALJ should recontact a treating physician when the information the physician provides is inadequate for the ALJ to determine whether the applicant is actually disabled. 20 C.F.R. § 404.1512(e) ("When the evidence we receive from your treating physician . . . is inadequate for us to determine if you are disabled . . . [w]e will . . . recontact your treating physician . . . to determine whether the additional information we need is readily available."). The regulations do not require an ALJ

53

to recontact a treating physician whose opinion was
inherently contradictory or unreliable. This is especially
true when the ALJ is able to determine from the record
whether the applicant is disabled. See Sultan v. Barnhart,
368 F.3d 857, 863 (8th Cir. 2004) (holding that there is no
need to recontact a treating physician where the ALJ can
determine from the record whether the applicant is
disabled). In this case, the issue was not whether the
treating physicians' opinions were somehow incomplete. The
ALJ found them refuted by the record and the treating
physicians' own earlier opinions and advice. The ALJ was
under no obligation to recontact the treating physicians
under such circumstances.

In this case, the ALJ did not find that Dr. Trimble's
opinion was incomplete. She found that Dr. Trimble's opinion was
refuted by the record and Dr. Trimble's own records and advice.
Therefore, the ALJ was under no duty to recontact Dr. Trimble
prior to finding plaintiff not disabled.

## VII. CONCLUSIONS

Based on all of the above, I find that the substantial
evidence in the record as a whole supports the ALJ's finding that
plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is
denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 26, 2009

54